UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:24-CT-3259-BO

| | |
|---|---|
| LARRY JUNIOR MERIS<br>Plaintiff,<br><br>v.<br><br>DOMANICK SMITH, *et al.*,<br>Defendants. | **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Defendants, Domanick Smith, Stephen Fonville, and Delmar Holder (hereinafter "Defendants"), by and through, Undersigned Counsel, respectfully requests the Court grant summary judgment on their behalf because Plaintiff's Eighth Amendment claims should fail for the following reasons: (1) Defendants cannot be sued in their official capacities; and (2) Defendants did not use excessive force when they extracted Plaintiff from the cell when he was repeatedly disobeying orders.

## I. <u>STATEMENT OF CASE</u>

On June 4, 2024, Plaintiff filed his complaint alleging that Domanick Smith, Stephen Fonville, and Delmar Holder violated Plaintiff's Eighth Amendment rights. [DE-1]. The Court's Frivolity Order allowed Plaintiff's excessive force claims against Defendants Smith, Fonville, and Holder. [DE-8]. The Court dismissed the claims against Hackney and Hutchinson. *Id.* Discovery is now complete, and the matter is ripe for summary judgment.

## II. STATEMENT OF FACTS

### A. BACKGROUND

According to Plaintiff's Offender Public History, Plaintiff was convicted on January 24, 2022 for First Degree Kidnapping and Assault Inflicting Serious Injury on a Law Enforcement Officer and sentenced to a minimum term of seven years and three months and a maximum term of nine years and nine months. Exhibit 1 at Ex. A at 1-2. Plaintiff is projected to be released on February 23, 2028. *Id*.

Plaintiff committed the following infractions while in custody: (1) two counts of threatening to injure staff; (2) two counts of assault staff by throwing liquids, (3) four counts of disobey order, (4) two counts of weapon possession, and (5) fighting. Exhibit 1 at Ex. B.

### B. ALLEGED INCIDENT

On June 4, 2024, Plaintiff refused to leave his recreation cell after his recreation time was over. *Id*. at Ex. C. at 25. In response, Lieutenant Dawson ordered Plaintiff to submit to cuffs multiple times. *Id.* at Ex. C. at 1. Plaintiff refused. *Id*. After Lieutenant Dawson left, she formed a cell extraction team. *Id.* Afterwards Sergeant Ghere unsuccessfully attempted to resolve the conflict with Plaintiff by speaking with him in hopes of gaining his compliance with the order. *Id*.

Captain Hackney approached Plaintiff and ordered him to "cuff up." *Id*. at Ex. G at (0:27-35). Plaintiff aggressively stated something along the lines that he is "ready to take this… right here, right now…Let's get it over with." *Id*. at (0:30-35). Afterwards, Captain Hackney asked Plaintiff "so do you refuse to cuff up?" *Id*. at (0:35-0:36). Plaintiff replied "Look, I know y'all want to whoop my ass." *Id*. at (0:36-

0:37). Captain Hackney faced the camera and stated that the offender has "been given several directives to be restrained from the back. Failure to comply." *Id*. at (0:36-0:42). Captain Hackney gave Plaintiff one last chance to submit to handcuffs. *Id*. at (0:52-0:55). Plaintiff responded stating "bruh, I'm not cuffing bruh." *Id*. at (0:55-0:57).

Both Captain Hackney and Sergeant Ghere left the recreation yard and went inside the prison. Sergeant Ghere announced to the cell extraction team that Plaintiff refused to get off the recreation yard. *Id.* at (1:59-2:21). The cell extraction team consisted of the following members: Correctional Officer Apelt as team member one (known as the shield operator, and is responsible for placing Plaintiff on a flat surface); Correctional Housing Unit Manager ("C.H.U.M.") Smith as team member two (responsible for controlling Plaintiff's right upper torso); C.H.U.M. Fonville as team member three (responsible for controlling Plaintiff's upper left torso); Correctional Officer Holder as team member four (responsible for controlling the right lower torso); Sergeant Ham as team member five (responsible for controlling the lower left torso); Correctional Officer Manning was team member six (responsible for recording the cell extraction); and Sergeant Ghere was team member seven (responsible for leading the cell extraction team.). Exhibit 1 at Ex. G. at (1:59-3:23); Exhibit 1 at Ex. C at 1-3. *Decl. of Smith* at ¶ 6. *Decl. of Fonville* at ¶ 5. *Decl. of Holder* at ¶ 5. Once the extraction team was assembled and prepared, the officers walked toward Plaintiff's cell.

Plaintiff needed to leave his cell because his recreation time ended. *Decl. of Fonville* at ¶ 6. *Decl. of Holder* at ¶ 5*, Decl. of Smith* at ¶ 5. The Sergeant and Captain

did not use OC Spray because of the risk to staff due to the wind direction and proximity. Exhibit 1 at Ex. G at (0:42-0:52); Exhibit 1 at Ex C. at 10.

Right before the extraction team entered Plaintiff's cell, Plaintiff can be seen aggressively gesturing around. *Id.* at Ex. G at (4:40-5:00). As the door opened, Plaintiff faces the correctional officers directly and aggressively approaches them. *Id.* at (5:00-5:05). Then, a correctional officer stated, "stop resisting, Meris, stop resisting." *Id.* at (5:06-5:14). Plaintiff was placed on the ground. Exhibit 1 at Ex. C. at 14-15. Defendants Smith and Fonville, with great difficulty, placed handcuffs on Plaintiff. *Decl. of Smith* at ¶ 9; *Decl. of Fonville* at ¶ 9.

1. <u>Defendant Smith's Involvement</u>

Defendant Smith's involvement was aimed to control Plaintiff's upper right torso. *Decl. of Smith* at ¶ 6. During the cell extraction, Defendant Smith controlled Plaintiff's upper right flank by placing his right hand on Plaintiff's left wrist and his left hand on Plaintiff's upper right arm, placing his arm behind his back to be handcuffed. Exhibit 1 at Ex. C. at 14. During the process, Plaintiff resisted by wiggling around which made the restraint process very difficult. *Decl. of Smith* at ¶ 9.

2. <u>Defendant Fonville's Involvement</u>

Defendant Fonville's primary responsibility during the cell extraction was to focus on Plaintiff's upper left torso. *Decl. of Fonville* at ¶ 5. Defendant Fonville assisted Defendant Smith by placing the handcuffs on Plaintiff. *Decl. of Fonville* at ¶ 9. Defendant Fonville was on both knees while Plaintiff was on his stomach. *Id.* at ¶

10. Plaintiff turned his head toward Defendant Fonville and attempted to bite his left knee area. *Id*. Defendant Fonville delivered two knee spears to the Plaintiff's suprascapular nerve (shoulder blade) on his right side. *Id*. Plaintiff refused commands to place his hands on his back, therefore Defendant Fonville had to apply the inverted finger technique. *Id*. Afterwards, Plaintiff still resisted by moving side to side. *Id*. Therefore, Defendant Fonville applied the inverted finger method to his left hand. *Id*. After Defendant Fonville completed the cell extraction, he escorted Plaintiff to medical to be treated. *Decl. of Fonville* at ¶ 11.

3. Defendant Holder's Involvement

Defendant Holder's responsibility during the cell extraction was mainly to control the Plaintiff's lower left torso and to place restraints on his legs. *Decl. of Holder* at ¶ 10. Defendant Holder observed Plaintiff kicking, moving his arms, and moving back and forth while he was attempting to place leg restraints on Plaintiff. *Decl. of Holder* at ¶ 9. After Defendant Holder completed the cell extraction, he escorted Plaintiff to medical to be treated. *Decl. of Holder* at ¶ 9-10.

C. Plaintiff's Disciplinary Conviction

Plaintiff pled guilty to disobey order on June 11, 2024. Exhibit 1 at Ex. E. at 1, 3. In the present case, Plaintiff disobeyed direct orders from multiple correctional officers and pled guilty to the infraction. *Id*. Thus, it is undisputed that he disobeyed several direct orders to submit to handcuffs.

D. Plaintiff's Medical History

Plaintiff received medical attention after the cell extraction. [DE-1 at 5]. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

E. NCDAC's USE OF FORCE POLICY.

At all times, Defendants acted in accordance with NCDAC use of force policies. The policy allows the "use of force only to the extent reasonably necessary for a proper correctional objective." Exhibit 1 at Ex. F, NCDAC Policy Manual Chapter F: Section .1500 Use of Force at F.1503(A). However, this prohibition shall not be construed to mean that staff must suffer an assault upon their person before taking appropriate defensive action or that the use of force by another must be met with strictly equal force on the part of the staff." *Id.* Reasonable force is authorized to ensure compliance with a lawful order. *Id* at Ex. F at .1503(b). After a use of force incident, an inmate should be medically screened. *Id.* at Ex F. at .1505(a).

## III. STANDARD OF REVIEW

Courts should grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts

for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The party moving for summary judgment has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Thereafter, the burden shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324.

Instead, the nonmoving party must "identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (emphasis added). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Celotex Corp.*, 477 U.S. at 323. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Industr'l Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). Courts have an affirmative duty to prevent factually unsupported claims from proceeding to trial. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

## IV. LEGAL ARGUMENT

### A. PLAINTIFF'S OFFICIAL CAPACITY CLAIMS ARE BARRED BY THE EIGHTH AMENDMENT

Plaintiff's claim against Defendants in their official capacity should be dismissed because the Eleventh Amendment bars such claims unless the state has waived its immunity, and the State of North Carolina has not done so. Section 1983 "does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivation of civil liberties." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 66 (1989). The Eleventh Amendment "bars such suits unless the State has waived its immunity…or unless Congress has exercised its undoubted power under Section Five of the Fourteenth Amendment to override that immunity." *Id.*

The Eleventh Amendment is also applicable to state officers sued in their official capacity. *Ford Motor Co. v. Dept. of Treasury*, 323 U.S. 459 (1945). "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office. As such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71. "State officials acting in their official capacity are therefore not 'persons' for the purposes of § 1983 and are not proper defendants to a Section 1983 lawsuit." *Diggs v. Balogun*, Case No. TDC-15-0535, 2017 U.S. Dist. LEXIS 180135, at *14 (D. Md. Oct. 31, 2017) (citing *Will*, 491 U.S. at 71).

In this case, Plaintiff's Complaint alleges an excessive force claim against Defendants in both their individual and official capacity. [DE-1]. The Court's frivolity order did not specifically address Plaintiff's official capacity claim against Defendants

Smith, Fonville and Holder. [DE-9]. However, as discussed above, Plaintiff cannot legally allege claims against Defendants Smith, Fonville and Holder in their official capacities because Defendant is not a "person," but instead, an extension of the State of North Carolina and her agency, the NCDAC, who has not waived sovereign immunity. Therefore, Defendants are entitled to summary judgment for the official capacity claims.

### B. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE EXCESSIVE FORCE CLAIMS IN THEIR INDIVIDUAL CAPACITY

An inmate must show that there was excessive force under both the (1) objective, and (2) subjective prong. *Alexander v. Connor*, 105 F.4th 174, 182 (4th Cir. 2024). The subjective prong asks "'whether force was used in a good-faith effort to maintain restore discipline, or maliciously or sadistically to cause harm." *Iko v. Shreve*, 535 F.3d 225, 239 (2008) (citing *Hudson*, 503 U.S. 1, 7 (1992)). When an inmate is engaged in "disruptive conduct that threatens the safety of prison staff," correctional staff are accorded "wide-ranging deference in the adoption and execution of policies and practices" necessary to "maintain institutional security." *Cutner v. Canning*, No. 6:23-CV-2534-RMG, 2024 U.S. Dist. LEXIS 153654, at *1-2 (D.S.C. Aug. 27, 2024) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

Regarding the subjective component, the court considers the following four factors: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response." *Moore v. Danza*, 726 F.Supp.3d. 459, 474

(4th Cir. 2024) (citing *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). Therefore, the Court is required to consider the reasonableness of the officer's conduct not with twenty-twenty hindsight. *Id.*

1. The Use of Force Was Necessary

Correctional officers act with a "permissible motive" or a "good faith effort to maintain or restore discipline" in the following circumstances: "(1) [W]hen they confront immediate risks to physical safety; [and] when they attempt to 'preserve internal order' by compelling compliance with prison rules and procedures." *Brooks*, 924 F.3d at 113. The courts owe correctional officers "wide ranging deference' in their determinations that force is required to induce compliance with policies important to institutional security.'" *Id.*

In *Leary,* several correctional officers sent the plaintiff to medical. *Leary v. Bullard*, No. 1:23CV903, 2025 U.S. Dist. LEXIS 149918, at *9 (M.D.N.C. Aug. 5, 2025). While the plaintiff was in medical, the plaintiff attempted to headbutt Officer Sampson. *Id.* In response, the officers used hands-on force to restrain the plaintiff. *Id.* at *9-10. The court held that the first *Whitley* factor favored Defendants because the plaintiff was combative and attempted to headbutt Defendant Sampson. *Id*, at *16.

In *Jasmine*, Defendant Ebson escorted the plaintiff to urgent care. *Jasmaine v. Ebson*, No. 5:18-CT-3227-BO, 2020 U.S. Dist. LEXIS 170531, at *4 (E.D.N.C. Aug. 31, 2020). During the escort, the plaintiff started resisting by refusing to walk. *Id.* Therefore, Defendant Ebson ordered plaintiff to continue walking. *Id.* at *5. She

refused. *Id*. As a response, Officer Ebson, applied the inverted finger position to gain her compliance. *Id*. The plaintiff started complying and continued to walk. *Id*. Then, she resisted again. *Id.* at *6. So officer Ebson "placed her hand at the top center of plaintiff's head to apply counter pressure to the inverted finger position" which gained plaintiff's compliance. *Id*. The court held that Ebson's use of compliance techniques to gain control over plaintiff when she resisted satisfied the first *Whiley* factor. *Id.* at *10.

In the present case, Plaintiff refused to obey *multiple* orders to submit to handcuffs, which lead to the initial cell extraction. Furthermore, when Plaintiff was already on the ground, Plaintiff further resisted by attempting to assault Defendant Fonville by biting him. None of the officers were able to use pepper spray because of the wind direction and proximity. Therefore, Defendant Fonville had to use hands-on force which was to use his knee to Defendant's suprascapular nerve (upper shoulder blade) so that Plaintiff would not bite him. The force was directly in response to Plaintiff's actions. After this, Defendant Fonville told Plaintiff several times to place his hands behind his back so Plaintiff could be handcuffed. He applied the inverted finger once on each hand in direct response to Plaintiff's refusal and resistance.

Here, the court should find the First *Whitley* factor in favor of each defendant for the following reasons: (1) Defendant Fonville only used his knee to plaintiff's suprascapular nerve (upper shoulder) to prevent Plaintiff from biting him; (2) Plaintiff was a difficult inmate during the extraction because he was wiggling around, kicking and making the cell extraction difficult, therefore it was difficult for

Defendant Fonville and Smith to get the handcuffs on correctly, as a result, Defendant Fonville applied the inverted finger method only to get handcuffs on him.

2. The Amount of Force Was Proportional to the Need for Force

The second *Whitley* factor turns on "the relationship between the need and the amount of force used." *Moore*, 726 F.Supp.3d at 475. One of the factors that the court looks at is whether the inmate continues to resist as force is applied. *Id*. at 476. When there is "a volatile set of circumstances" including where an inmate is resisting, then that may justify "successively increasing applications of force" by the defendant. *Id*.

In *McClary*, where plaintiff had a weapon and "refused numerous direct orders to submit to restraints, the extraction itself appears to be a proportionate response" to the threat Plaintiff posed. *McClary v. Holder*, No. 5:18-CT-3051-FL, 2021 U.S. Dist. LEXIS 53228, at *13 n.8 (E.D.N.C. Mar. 22, 2021). The bent-wrist technique is a NCDPS' approved technique which is employed in order to gain compliance from handcuffed inmates who are resisting officers. *Sears v. United States*, No. 5:12-CT-3078-BO, 2015 U.S. Dist. LEXIS 91235, at *8 (E.D.N.C. July 13, 2015)

Here, multiple officers told Plaintiff to submit to handcuffs. Plaintiff aggressively refused to submit to handcuffs and cursed at the correctional officers. Captain Hackney, Sergeant Ghere and Lieutenant Dawson tried to communicate with the Plaintiff to tell him that he needed to cuff up to be back into his cell. The entire cell extraction could have been avoided had Plaintiff simply submitted to handcuffs as he knew that recreation time was over. Furthermore, Defendants acted proportionally to each individual threat. Specifically, when Plaintiff attempted to bite

Defendant Fonville, he responded proportionally by using his knees to prevent the assault. Then, when Plaintiff refused to submit his hands for handcuffs and actively resisted, Defendant Fonville responded proportionally by using the inverted finger technique to gain Plaintiff's compliance. Therefore, the force used in the cell extraction to get plaintiff to comply was proportional. Thus, the totality of the circumstances demonstrate that the second *Whitley* factor favors Defendants.

3. Plaintiff Was a Perceived Threat

As for the third *Whitley* factor to determine whether there is a perceived threat, the court may consider the inmate's disciplinary and criminal history. *Harper v. McCloud,* 2014 U.S. Dist. LEXIS 37177, *66-69 *S.D. W.Va., *aff'd*, 575 Fed. Appx. 206, 2014 U.S. App. LEXIS 11779 (4th Cir. W. Va., 2014).

When an inmate is displaying obstinate behavior, correctional officers cannot "simply acquiesce to plaintiff's obstinate behavior and still maintain discipline." *Moore*, 726 F. Supp. 3d at 475. "[O]fficers act in a good faith effort to maintain or restore discipline ... when they attempt to preserve internal order by compelling compliance with prison rules and procedures." *Brooks v. Johnson*, 924 F.3d 104, 113 (4th Cir. 2019).

Plaintiff is in prison for first-degree kidnapping and has an extensive infraction history, including threatening staff, assaulting staff by throwing liquids, and weapon possession. Therefore, Plaintiff has a history of threatening behaviors during his incarceration.

Prior to his cell extraction, Plaintiff continuously disobeyed direct orders. Correctional staff perceived a threat to institutional security as Plaintiff continued to disobey their orders and use profanity. Then, as the cell extraction started, Plaintiff became an actual threat because Plaintiff walked up to the officers aggressively as the cell door opened and attempted to push past them. Plaintiff continued to be a threat when he actively resisted being restrained by wiggling around and fighting off the restraints. Lastly, Plaintiff was also a threat because he attempted to bite Defendant Fonville. Therefore, the third *Whitley* factor favors the Defendants.

4. <u>Defendants Tempered Their Response</u>

The court should take into consideration that Lieutenant Dawson, Sergeant Ghere and Captain Hackney already tried to de-escalate the situation before Defendants arrived on scene. In fact, the only reason for the cell extraction is because Plaintiff refused to get out of the cell after multiple commands. Specifically, Sergeant Ghere gave Plaintiff at least two commands to submit to handcuffs, which he refused; and Captain Hackney gave Plaintiff commands to submit to handcuffs, which he also refused. Simply put, Plaintiff was given <u>**multiple**</u> commands to leave recreation and refused them all – necessitating that force be used to get him out of the recreation cage. Even after Plaintiff resisted by wiggling around and kicking, staff only used the force necessary to get him under control and restrained. Therefore, Defendant's response was tempered, meaning that the fourth *Whitley* factor favors Defendants.

5. Other Factors Show a Good-Faith Use of Force

In addition to the abovementioned *Whitley* factors, the Court should take into consideration additional factors relevant to Defendants' intent. First, this is a situation of Plaintiff's creation. Had he simply left his recreation cell and gone back to his own cell, this incident would not have occurred. Second, Defendants Fonville and Holder escorted Plaintiff to medical. If they were sadistic and malicious, they could have decided not to escort Plaintiff to medical. Third, Defendants held no ill-will towards Plaintiff, and he was just another inmate to him. *Decl. of Smith* at ¶ 12; *Decl. of Holder* at ¶ 13; *Decl. of Fonville* at ¶ 13. Fourth, Plaintiff did not provide any evidence to prove that Defendants acted maliciously and sadistically in their use of force; instead, Plaintiff only presents his conclusory allegations. Therefore, the Court should find that Plaintiff failed to satisfy the subjective element.

**C. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY**

Qualified immunity is a doctrine which shields government officials from liability from damages so far as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009) *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The first task the Court must do is to identify the "specific right the plaintiff asserts was infringed by the challenged conduct[.]" *Winfield v. Bass*, 106 F.3d 525,

530 (4th Cir. 1997) (citing *Taylor v. Waters,* 81 F.3d 429, 433 (4th Cir. 1996)). Then, the Court must ask (in no particular sequence) (1) whether on the facts Plaintiff alleged or shown "make out a violation of a constitutional right" and (2) whether that constitutional right was "clearly established" at the time of the alleged incident. *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

As shown above, Plaintiff's constitutional rights were not violated. However, even if the Court were to find that Plaintiff's rights were somehow violated, such rights were not clearly established. Specifically, Plaintiff's right to disobey orders, act disruptively, and stay at a recreation yard for an unlimited amount of time was not clearly established. Therefore, Defendants are entitled to qualified immunity.

## V. CONCLUSION

For all the above reasons, Defendants should be granted summary judgment.

Respectfully submitted this the 10th day of December 2025.

**JEFF JACKSON**
Attorney General

/s/ Zachary Smith
Zachary A. Smith (N.C. Bar No. 61116)
Assistant Attorney General
N.C. Department of Justice
Public Safety Section
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6529
Fax: 919-716-6761
zsmith@ncdoj.gov

## CERTIFICATE OF SERVICE

I certify that, on this day, I electronically filed this foregoing document with the Clerk of the Court utilizing the CM/ECF system and will cause the same to be served upon Plaintiff, a non-CM/ECF participant, via regular United States Mail addressed as follows:

Larry Junior Meris
1260205
Alexander Correctional Institution
633 Old Landfill Rd.
Taylorsville, NC 28681

This 10th day of December 2025.

/s/ Zachary A. Smith
Zachary A. Smith
Assistant Attorney General